UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

DOMINGO OJEDA,

                Plaintiff,

      -against-

METROPOLITAN TRANSPORTATION
AUTHORITY,

                Defendant.
---------------------------------------------------------------X

**OPINION AND ORDER**

16 Civ. 00003 (JCM)

On November 12, 2019, the Court commenced a jury trial in the instant matter. At the conclusion of the trial on November 15, 2019, the jury rendered a unanimous verdict finding Plaintiff Domingo Ojeda ("Plaintiff") 80% at fault, Defendant Metropolitan Transportation Authority's ("MTA" or "Defendant") 20% at fault, and awarding Plaintiff $2,650,000. (Docket No. 139). Before the Court are Defendant's motions for: (1) a renewed judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), (2) a new trial pursuant to Fed. R. Civ. P. 59(a)(1)(A), and (3) a remittitur pursuant to Fed. R. Civ. P. 59(e) and 60(b). (Docket No. 142). Defendant also requests a hearing to determine the appropriate set-off amount for the wages it claims to have already paid to Plaintiff. (*Id.*). Plaintiff opposes the motions. (Docket No. 147). Defendant further requests a stay of enforcement of the judgment pursuant to Fed. R. Civ. P. 62(b) pending the Court's disposition of its motions. (Docket No. 143). For the reasons set forth below, (1) Defendant's motions pursuant to Rules 50, 59, and 60 are denied, (2) Defendant's request for a hearing is granted in part and denied in part, and (3) Defendant's motion to stay the enforcement of the judgment pursuant to Rule 62(b) is granted.

## I.  BACKGROUND

The Court assumes familiarity with the underlying facts of this case and only summarizes the relevant facts.

### A.  The Incident

On the evening of October 2, 2013, Plaintiff was working as an Emergency Services Unit ("ESU") police officer for the MTA performing general patrol and security duties with his partner, Officer Greg Cella ("Cella"), at the Harrison train station in Harrison, NY ("Harrison Station"). (Trial Tr.[1] at 112-13).  Plaintiff and Cella were assigned to an ESU truck, which contained two doors in the front, and a section in the back to carry equipment. (*Id.* at 113, 202-03); (Docket No. 147-2 at 24-26).  While Plaintiff and Cella were monitoring the train station from their vehicle, Plaintiff noticed a male and female engaged in a dispute. (Trial Tr. at 125-26).  Plaintiff immediately alerted Cella; they both exited the truck and approached the two suspects and separated them. (*Id.* at 126-27, 129).  Cella stayed with the female and Plaintiff was with the male. (*Id.* at 129).  Cella approached Plaintiff to tell him that he believed the female said there was an order of protection against the male suspect, but Cella could not completely understand her because she was speaking in Spanish. (*Id.*).  Plaintiff and Cella switched suspects so Plaintiff could communicate with the female in Spanish to gather more information. (*Id.*).

The officers subsequently confirmed that the male suspect had, in fact, violated an order of protection, so Plaintiff proceeded to arrest and handcuff him. (Trial Tr. at 132).  The MTA then dispatched a backup sector car to the scene to transport the suspect. (*Id.* at 143-44).  Meanwhile, the female approached Plaintiff while Cella, who was standing 10 to 15 feet away, was on a call relating to the situation. (*Id.* at 133).  Plaintiff was responsible for the male arrestee

---

[1] Refers to the transcript of the trial, which was held on November 12 to 15, 2019.

at this time. (*Id.* at 134-35).  After the female approached, the situation between the male and female escalated again, prompting Plaintiff to lean closer to the female to quietly ask whether the male suspect was on drugs. (*Id.* at 135).  At that point, Plaintiff heard a voice yell out, "running," and realized the arrestee had fled. (*Id.*).  The backup officers still had not arrived at the scene to transport the arrestee. (*Id.* at 138, 167).

Plaintiff chased after the suspect and followed him up a hill in an attempt to subdue him. (Trial Tr. at 136-37).  About 30 to 40 feet into the chase, Plaintiff felt a "pop" in his left lower calf /Achilles heel and immediately felt pain. (*Id.* at 136, 215, 152).  By the time Plaintiff got to the top of the hill, he saw Cella arriving at the location in the ESU truck. *(Id. at* 127-38).  Cella then called for further backup, which arrived approximately 20 minutes after the suspect had initially fled. (*Id.* at 141-45).  The officers searched for the suspect for several hours, but they never found him. (*Id.* at 140-145).  As a result of his ankle injuries, Plaintiff went on sick leave and underwent surgery and physical therapy. (*Id.* at 181-87).  Plaintiff eventually returned to work at the MTA on "restricted duty." (*Id.* at 173, 190).  He was never able to return full time as an MTA police officer. (*Id.* at 176).  Plaintiff's employment with the MTA ended on February 16, 2016 for reasons unrelated to this matter. (*Id.* at 195-96).

**B.  The Claims**

Plaintiff commenced the instant action under the Federal Employers' Liability Act ("FELA"), alleging that the MTA was negligent for injuries he sustained during his employment as an MTA police officer. (Docket No. 29) ("Amended Compl.").[2]  Under FELA:

> [e]very common carrier by railroad … shall be liable in damages to any person suffering injury while he [or she] is employed by such carrier … for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier or by reason of any defect or insufficiency, due to its negligence, in its cars,

---

[2] On July 24, 2018, the parties consented to conduct all proceedings before this Court pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 87).

engines, appliances, machinery, track, roadbed, works, boards, wharves, or other equipment.

45 U.S.C § 51. Liability under FELA is found "if [the railroad's] negligence played a part–no matter how small–in bringing about the injury." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 705 (2011) (alteration in original).

Plaintiff claimed that the injuries he sustained on October 2, 2013 while running after the fleeing suspect were caused solely by the negligence, carelessness, and recklessness of the MTA and its agents for failing to provide Plaintiff with a reasonably safe place to work and equipment with which to work. (Amended Compl. ¶ 21). Specifically, Plaintiff alleged that the MTA was negligent for failing to provide Plaintiff with appropriate and timely backup, failing to provide Plaintiff with a police vehicle that was properly equipped with a containment facility for persons under arrest, and for the negligence of Cella for leaving Plaintiff alone to manage two suspects. (*Id.*).

**C. Trial and Verdict**

A jury trial commenced on November 12, 2019 before this Court. (Trial Tr. at 1). Two witnesses testified on behalf of Plaintiff. Plaintiff testified about his experience as a patrol officer and an ESU officer with the MTA and being assigned to a patrol vehicle, the training he received, as well as to what he personally observed Cella doing during the night of the incident. (*Id.* at 100-167). Plaintiff also testified regarding his injuries, his time off work, and the various medical procedures he endured. (*Id.* at 168-189). Dr. McWilliam, Plaintiff's treating orthopedist, testified regarding his treatment of Plaintiff, the extent of the injury, and the potential permanence of the injury. (Docket No. 147-3 at 5-58). Defendant only called one witness – Cella – to testify. (Docket No. 147-2). Cella testified regarding his experience as an MTA ESU police officer and his observations and actions during the night of the incident. (*Id.* at 29-135).

4

He also testified about the details of the ESU truck they were using, how ESU officers are trained to make arrests, and his observations regarding other MTA officers that are assigned to patrol with or without vehicles. (*Id.* at 20-29)  No experts testified on behalf of either party.

Prior to the jury verdict, Defendant moved for a directed verdict on the grounds that: (1) Plaintiff failed to provide expert testimony on the standard of care of police conduct, which Defendant argued was required, and (2) the MTA was immune from liability under the governmental defense doctrine. (Trial Tr. at 354-55)  The Court denied Defendant's requests on the grounds that, although there was not a "wealth of evidence in this case on certain things," there was "enough to go to the jury." (*Id.* at 356)  Regarding the governmental immunity defense, the Court found that it is "not established that [governmental immunity] even applies in a FELA case." (*Id.* at 355)  The Court thereafter submitted the case to the jury. (*Id.* at 457).

On November 15, 2019, the jury returned a unanimous verdict for Plaintiff, awarding him: $750,000 for past lost earnings; $900,000 for future lost earnings; $300,000 for past pain and suffering; and $700,000 for future pain and suffering, for a total award of $2,650,000. (Trial Tr. at 514-15)  The jury further found Plaintiff 80% at fault and Defendant 20% at fault. (*Id.*); (*see also* Docket No. 139).  On November 18, 2019, a judgment was entered in favor of Plaintiff in the amount of $150,000 for past lost earnings; $180,000 for future lost earnings; $60,000 for past pain and suffering; and $140,000 for future pain and suffering, for a total award of $530,000. (Docket No. 139).  Defendant's post-trial motions followed. (Docket Nos. 142, 143).

**D.  Post-Trial Motions**

Defendant now moves for: (1) a renewed judgment as a matter of law pursuant to Rule 50 on the grounds that (i) Plaintiff failed to provide expert testimony on the standard of police conduct, which Defendant claims is required, and (ii) the MTA is immune from liability under

the governmental immunity defense; (2) a new trial pursuant to Rule 59 because of (i) the admission of evidence regarding Plaintiff's "disabled" status, and (ii) opposing counsel's "pervasive misconduct" throughout the trial; and (3) a remittitur pursuant to Rules 59 and 60 (i) to correct the error in allowing the jury to award future lost wages beyond the date of Plaintiff's termination from the MTA, (ii) to correct the jury's error in failing to adjust the award of lost wages by applicable tax rates, and (iii) because the amount awarded for pain and suffering is excessive. (Docket No. 142).  Defendant also requests a hearing to determine the amount of set-off wages Defendant already paid Plaintiff. (*Id.*).  Finally, Defendant moves for a stay of execution of the judgment pending the Court's decision on the instant motions under Fed. R. Civ. P. 62(b). (Docket No. 143).  The Court will address each in turn.

## II.  DISCUSSION

### A.  Motion for Judgment as a Matter of Law

### 1.  Legal Standard

Under Rule 50(b), a party "may file a renewed motion for judgment as a matter of law" no later than 28 days after trial. Fed. R. Civ. P. 50(b).  Generally, the grounds on which a party may rely in a Rule 50(b) motion are "limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (internal quotations omitted); *accord Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994) (noting that "judgment as a matter of law is limited to those issues 'specifically raised in [a] prior motion for a directed verdict.'") (internal citations omitted) (alteration in original).

"In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it 'must draw all reasonable inferences in favor of the nonmoving party, and it may not

make credibility determinations or weigh the evidence.'" *Cross v. N.Y.C. Trans. Auth.*, 417 F.3d 241, 247 (2d Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  The moving party's burden in securing Rule 50 relief is "particularly heavy after the jury has deliberated in the case and actually returned its verdict." *Id.* at 248.  Thus, a court may only grant a Rule 50(b) motion if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (internal quotations omitted) (alterations in original).

## 2.  Requirement of Expert Testimony

Defendant contends that the MTA is entitled to judgment as a matter of law because Plaintiff failed to provide expert testimony in support of his theories of liability, and, therefore, the verdict could only have been the result of "surmise and conjecture." (Docket No. 142 at 6). Defendant maintains that the "standard of care to which a reasonable police department and a reasonable police officer must be held is beyond the ken of lay jurors." (*Id.* at 4).  Defendant argues an expert was required to testify on the issues relating to average back up response time, the allocation of police resources, the reasonableness of assigning ESU officers to patrol in ESU vehicles that are not capable of transporting prisoners, and the reasonableness of Cella's actions during the incident. (*Id.* at 5).  Defendant further asserts that "[w]hether these theories were framed in terms of the MTA's official policies and practices" or based on Plaintiff's testimony "about his experiences of being assigned to a patrol car as well as what he saw Officer Cella doing during the arrest," it was improper for the jury in the instant case to evaluate the reasonableness of a police department's decisions regarding the dispatch of police personnel and

equipment, as well as the reasonableness of a police officer's actions while responding to a situation warranting intervention. (*Id.*).  It is for this reason, Defendant argues, that the jury lacked a "legally sufficient evidentiary basis to find for" Plaintiff. (*Id.* at 6).  Plaintiff disagrees, arguing that Defendant fails to cite any case law holding that expert testimony is "required" in this case. (Docket No. 147 at 14-16).  Plaintiff further maintains that Plaintiff's testimony was sufficient to establish his claims against Defendant "under the low and liberal relaxed standards of both negligence and causation had in matters tried under the ages of FELA." (*Id.* at 16).  For these reasons, Plaintiff argues, "an expert was neither 'required' nor necessary." (*Id.*).

The Court finds Defendant's argument unavailing.  First, this issue was fully briefed in the parties' motions *in limine* and decided by the Court. (*See* Nov. 14, 2018 Motions *in Limine* Bench Order ("Bench Order")), at 14-15, which held that while Plaintiff could not: "(i) testify about the MTA's official policies and practices of assigning police officers to a specific patrol group, and/or (ii) state whether Officer Cella acted negligently during the encounter based on the MTA's official policies and practices of detaining an arrestee," he could testify about his "experience of being assigned to a patrol group, as well as what he saw Officer Cella doing during the arrest so long as his testimony is based on his own observations and experiences.").  Plaintiff's testimony fell within the general parameters of the Court's ruling.  To the extent it did not, the Court sustained Defendant's objections accordingly. (*See, e.g.*, Trial Tr. at 201-02).

Second, Defendant fails to provide the Court with any Second Circuit case law standing for the proposition that an expert is required to demonstrate negligence in FELA cases.  For instance, Defendant relies on *Murphy v. Metropolitan Transp. Auth.,* 548 F. Supp. 2d 29 (S.D.N.Y. 2008), in support of its contention that "the standard of care to which a reasonable police department and a reasonable police officer must be held is beyond the ken of lay jurors."

8

(Docket No. 142 at 4).  However, that case does not support this proposition.  The Court in *Murphy* granted summary judgment because the plaintiff "failed to raise a jury question with respect to either negligence or causation" where the plaintiff "present[ed] *no evidence*" that the defendant's conduct was unreasonable "beyond his own opinion testimony that he does not believe that this was the right call to make." *Murphy*, 548 F. Supp. 2d at 39. (emphasis added). The court did not hold, however, that the use of an expert is required in such cases.

Here, while it may have been helpful for Plaintiff to present expert testimony on the standard of care of police practices, the Court finds that he was not *required* to do so.  Thus, the Court agrees with its ruling at trial that there was enough evidence to go to the jury. *See supra*, Section I.C.  This is especially true in light of the "strong federal policy" in favor of letting juries decide cases arising under FELA, *Sinclair v. Long Island R.R.*, 985 F.2d 74, 77 (2d Cir. 1993) (internal quotations omitted), and the "relaxed standard of negligence [that] applies in FELA cases in this Circuit," *Williams v. Long Island R.R.*, 196 F.3d 402, 407 (2d Cir. 1999); *see also Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 826-28 (2d Cir. 1994) (which reversed the trial court's judgment as a matter of law in a FELA case, and holding that, "[w]ithout contesting the essentially freakish character" of the incident, a FELA case "must not be dismissed at the summary judgment phase unless there is *absolutely no reasonable basis* for a jury to find for the plaintiff.") (emphasis added); *Kendall v. Metro-North Commuter R.R.*, No. 12 Civ. 6015(DLC), 2014 WL 1885528, at *4, 7 (S.D.N.Y. May 12, 2014) (which denied summary judgment where, "under the relaxed standard of negligence" under FELA, plaintiff raised a genuine question of material fact as to both causation and negligence without her expert, noting that "in the ordinary FELA case, 'circumstantial evidence, expert testimony, *or common knowledge* may provide a basis from which the causal sequence may be inferred.'") (emphasis added) (internal citations

omitted); *Nelson v. Metro-N. Commuter R.R.*, 235 F.3d 101, 106 (2d Cir. 2000) ("[T]he quantum of evidence that suffices in FELA cases is significantly lower than in ordinary tort cases."); *Burns v. Penn Central Co.*, 519 F.2d 512, 514 (2d Cir. 1975) ("Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played *any* part, *even the slightest*, in producing the injury or death for which damages are sought." (emphasis added) (quoting *Rogers v. Missouri Pacific R.R.*, 352 U.S. 500, 506 (1957)). In sum, in FELA actions, "juries have more latitude to infer negligence than at common law, such that the question can rarely be taken from them and decided by the court as a matter of law." *Coale v. Metro-N Commuter R. Co.*, 621 Fed. App'x 13, 14 (2d Cir. 2015)*; see also Williams*, 196 F.3d at 407 (which held that "plaintiff's case should have been allowed to go to the jury" based on "plaintiff's testimony alone," and noting that "[o]nly in instances where reasonable jurors could reach only one conclusion may the court take the determination from the jury and decide the question as a matter of law.") (internal quotations omitted).

Thus, viewing the evidence in the light most favorable to Plaintiff, and giving him the benefit of all reasonable inferences, the Court "cannot say that the jury's findings were the result of 'sheer surmise and conjecture' or that fair minded persons could not have arrived at this verdict." *Stratton v. Dep't for the Aging for the City of N.Y.*, 132 F.3d 869, 879 (2d Cir. 1997) (quoting *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1022 (2d Cir. 1995)).  In other words, the evidence presented at trial was sufficient to support the jury's finding that Defendant was 20% negligent for failing to provide Plaintiff with a reasonably safe place to work under FELA.

### 3. Governmental Immunity Defense

Defendant further argues that it was entitled to judgment as a matter of law under Rule 50(b) on the basis that the MTA is entitled to immunity under the governmental function defense

doctrine. (Docket No. 142 at 6).  Defendant maintains that this defense applies to the MTA because discretion is "inherent" in all of Plaintiff's theories of liability. (*Id.*).  This "exercise of discretion" includes, according to Defendant, the assignment of personnel, sending ESU officers on patrol without a vehicle capable of transporting prisoners, as well as Cella's decisions to contact dispatch, obtain relevant information about the suspect, and remain with the victim while Plaintiff handled the suspect. (*Id.* at 7).

The Court finds Defendant's argument unpersuasive for the same reasons articulated at trial. *See supra*, Section I.C.  Second Circuit case law does not establish that the governmental function defense applies in a FELA case.  Defendant principally relies on two cases in support of its contention, *Benoit v. Metro. Trans. Auth.*, No. 15 Civ. 6095(JFK), 2016 WL 6902190 (S.D.N.Y. Nov. 21, 2016), and *Ortiz v. Metro. Trans. Auth.*, No. 11 Civ. 5633(GBD), 2013 WL 55990 (S.D.N.Y. Jan. 4, 2013). (Docket No. 142 at 7).  However, neither case supports Defendant's argument that the governmental function defense applies here.  In *Ortiz*, while the court stated that certain supervisors made a "discretionary decision" in deciding how to handle an incident, the court did not grant summary judgment on this basis.  Rather, the court granted summary judgment because the plaintiff "failed to demonstrate that there was any hazard created by [Defendant's] supervisory discretion and that Defendant should have been aware of that hazard." 2013 WL 55990, at *4.  It does not hold, as Defendant represents, that "the governmental function defense applies to a police officer's decision as to whether and how to participate in a situation in which officers have intervened." (Docket No. 142 at 7).  In fact, nowhere in *Ortiz* does the court even mention the concept of the governmental function defense.

Defendant's citation to *Benoit* is equally misplaced.  There, the court explicitly declined to consider whether the governmental function defense is applicable under FELA. *See* 2016 WL

6902190, at *10 ("The Court need not determine whether the governmental function defense is applicable under FELA, however, because even if it is[,] the MTA has not identified any evidence that it exercised discretion …").  The Court, therefore, agrees with its previous ruling that the governmental function defense does not apply in FELA cases, and that the MTA is not entitled to immunity under such a defense. *See supra*, Section I.C.  Accordingly, the Court denies Defendant's renewed Rule 50(b) motion for judgment as a matter of law.

## B.  Motion for a New Trial

Defendant also argues that a new trial is warranted because of: (1) the admission of evidence regarding Plaintiff's "disabled" status, (Docket No. 142 at 8), and (2) opposing counsel's "pervasive misconduct," (*id.* at 17).  Rule 59(a) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Atkins v. N.Y. City*, 143 F.3d 100, 102 (2d Cir. 1998) (citation and quotations omitted).  When considering a motion for a new trial, the Court "need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998).  Furthermore, "[i]t is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).  Rule

59(a) motions are committed to the "sound discretion" of the court. *Id.* at 143.  For the reasons

that follow, the Court finds that a new trial is not warranted.

**1.  The Admission of Evidence Regarding Plaintiff's "Disabled" Status**

A district court has broad discretion over the admissibility of evidence at trial. *See Kogut*

*v. Cty. of Nassau*, 789 F.3d 36, 47 (2d Cir. 2015) (collecting cases).  Thus, a motion for a new

trial based on the erroneous admission of evidence is warranted only where the court made

substantial errors in admitting the evidence. *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202

(2d Cir, 2014).  Such relief is not to be granted unless the court finds that the introduction of

such evidence "was a clear abuse of discretion *and* was so clearly prejudicial to the outcome of

the trial that we are convinced that the jury has reached a seriously erroneous result or that the

verdict is a miscarriage of justice." *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005)

(internal quotations omitted) (emphasis in original).  The court must consider the error in light of

the entire record when evaluating whether a new trial is warranted. *See Graham v. City of New*

*York*, 128 F. Supp. 3d 681, 705 (E.D.N.Y. 2015); *see also Johnson v. Strive E. Harlem Emp't*

*Grp.*, 990 F. Supp. 2d 435, 450 (S.D.N.Y. 2014) ("Where there has been an objection, a new trial

is warranted if the Court's evidentiary ruling was 'clearly prejudicial to the outcome of the trial,'

taking into account 'the record as a whole.'") (quoting *Marcic v. Reinauer Transp. Cos.*, 397

F.3d 120, 124 (2d. Cir. 2005)).

Defendant argues that a new trial is warranted because the Court allowed the admission

of evidence regarding Plaintiff's "disabled" status. (Docket No. 142 at 8).  On the eve of trial,

Plaintiff's counsel proposed a newly disclosed exhibit. (Docket No. 142-2 at 56).  The document

consisted of an internal MTA memorandum from the MTA Police Chief to the MTA Deputy

Director of the MTA Consolidated Pensions. (*Id.*); (*see also* Docket No. 142-4).  Plaintiff's

counsel stated that he intended to use the document to prove that the MTA considered Plaintiff "disabled" and unable to return to work. (*See* Docket No. 142-2 at 56). He redacted any reference to the pension program itself and all references to "benefits," which would open the door to irrelevant issues relating to "collateral sources." (*Id.* at 55). The Court did not permit Plaintiff to offer the exhibit into evidence under Rules 401 and 403 on the ground that it would be "confusing to the jury," but allowed Plaintiff to "testify that the MTA put him in for disability benefits." (*Id.*). During counsel's direct examination of Plaintiff on this topic, the Court held a brief sidebar to address Defense counsel's objections to the line of questioning by Plaintiff's counsel. (Trial Tr. at 190-91). The Court held, in pertinent part, that "[t]he fact that [Plaintiff's] status was changed to disabled is relevant[,]" to which defense counsel responded, "I don't have a problem with that." (*Id.* at 193-95).

Although Defendant concedes it agreed to the relevancy of Plaintiff's disabled status during sidebar, it is troubled by the "*way* in which [P]laintiff's counsel elicited the evidence, which was misleading." (Docket No. 142 at 11) (emphasis added). Defendant contends that "Plaintiff's counsel asked a leading question that elicited more than the limited facts discussed at sidebar." (*Id.* at 10). Specifically, Defendant maintains that when Plaintiff's counsel asked, "[i]n August of [2015], was your status changed to disabled by Chief Cohen?" (Trial Tr. at 195), Plaintiff's responses introduced two additional facts into evidence: (1) that his status was changed in August 2015, which Defendant states is not true, and (2) that the "disabled" status was changed by the MTA Police Chief, which is also not true. (Docket No. 142 at 10-11); (Trial Tr. at 195-96). Defendant further argues that these facts were misleading because they were immediately followed by questions highlighting the fact that Plaintiff's employment with the MTA was terminated shortly thereafter, in February 2016. (Docket No. 142 at 10-11); (Trial Tr.

at 195-96; 426).  On this point, Defendant maintains that the jury was misled as to the

"potentially temporary nature" versus permanence of Plaintiff's "disabled" status. (Docket No.

142 at 11).  In sum, Defendant contends that the misleading nature of the evidence pertaining to

Plaintiff's "disabled" status prior to his termination from the MTA in February 2016 materially

swayed the jury's judgment, and led to a seriously erroneous verdict. (*Id.* at 12).

The Court finds that a new trial is not warranted by the introduction of evidence relating

to Plaintiff's "disabled" status because any potential prejudice caused by such testimony was

sufficiently cured by the Court's curative instructions. *See Tesser v. Board of Educ. of the City*

*School Dist. of the City of New York*, 190 F. Supp. 2d 430, 442 (E.D.N.Y. 2002) (internal

quotations omitted) (which denied motion for a new trial based on admission of evidence where

"any potential prejudice was sufficiently cured" by the court's limiting instructions) (internal

quotations omitted), *aff'd*, 370 F.3d 314 (2d Cir. 2004).  Specifically, as an alternative to striking

the testimony, which the Court was unwilling to do so in light of the fact that counsel for

Defendant had previously agreed to the relevancy of such testimony, (*see* Trial Tr. at 278), the

parties agreed to a curative instruction, (*id.* at 280).  The Court instructed the jury that although

they heard testimony that the MTA changed Plaintiff's status to disabled, they "should not

consider this fact to be an admission of the MTA's negligence nor should [they] consider it to be

an admission by the MTA that plaintiff is unable to work at any job other than as a full-duty

MTA police officer at the time the status was changed." (*Id.* at 287).  The Court further clarified

that "it cannot be considered dispositive of whether the disability is temporary or permanent,"

and that it is "the role of the jury after considering all of the evidence to determine whether

plaintiff's disability was temporary or permanent and what effect, if any, it had on his future

employment." (*Id.*).

In light of these curative instructions, and the fact that "juries are presumed to follow their instructions," *Zafiro v. United States*, 506 U.S. 534, 540 (1993), the Court finds that a new trial is not warranted because of counsel's line of questioning relating to Plaintiff's "disabled" status. *See Claudio v. Mattituck-Cutchogue Union Free School Dist.*, 955 F. Supp. 2d 118, 149 (E.D.N.Y. 2013) (which found that the court's "various warnings to plaintiff's counsel, along with its thorough limiting instructions to jury, were sufficient to counteract any question that might have been raised in the jury's mind" resulting from counsel's improper line of questioning.); *United States v. Potamitis*, 739 F. 2d 784, 790 (2d Cir. 1984) ("It is sound doctrine, to be sure, that juries must be supposed usually to be able and determined to follow instructions.") (citations omitted).  Thus, viewing the record as a whole, the Court is confident that the jury did not reach a "seriously erroneous" verdict as a result of such evidence. *Nimely*, 414 F.3d at 399.  Accordingly, Defendant's motion for a new trial on the ground that the Court improperly admitted evidence relating to Plaintiff's "disabled" status is denied.

## 2.  Counsel's Conduct at Trial

Defendant also contends that a new trial is warranted on the basis that Plaintiff's counsel engaged in a pattern of "pervasive misconduct" throughout the trial. (Docket No. 142 at 14).  When considering a motion for a new trial based on the alleged misconduct of opposing counsel, the court must consider the claim "in the context of the trial as a whole, examining, among other things, the 'totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, [and] the manner in which the parties and the court treated the comments.'" *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 429 (S.D.N.Y. 2008) (quoting *Hynes v. LaBoy*, 887 F. Supp. 618, 632 (S.D.N.Y. 1995)).  The Court is mindful that "[o]bviously not all misconduct of counsel taints a verdict to such a degree

as to warrant a new trial." *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992).  A new trial is warranted only "when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict." *Id.*; *see also Strobl v. N.Y. Mercantile Exch.*, 582 F. Supp. 770, 780 (S.D.N.Y. 1984) ("In ruling on a motion for a new trial based on attorney misconduct, the trial court must determine whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury.").  Moreover, "[t]rial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial." *Matthews v. CTI Container Trans. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989); *see also Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir. 1990) ("[T]he judge who was present throughout the trial [] is best able to determine the effect of the conduct of counsel on the jury."); *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (same).

Defendant argues that a new trial is warranted as a result of repeated misconduct by Plaintiff's counsel, such as "disregarding the Court's efforts to maintain fair and orderly presentation of evidence," "attempting to elicit inadmissible evidence," and "push[ing] back against the Court following a ruling or admonition not to counsel's liking." (Docket No. 142 at 14-15)*.*  Defendant contends that counsel's most egregious transgressions occurred during summations, which included his "singling out of one juror as an expert," his "numerous suggestions to the jury that it disregard the law," and his "suggestion of a dollar figure for pain and suffering damages in clear and direct contravention of the Court's pretrial orders, as well as the Court's warnings just moments earlier." (*Id.* at 15).  Specifically, Defendant points to counsel's "direct appeal to Juror 6," who was a former MTA police officer, in which he stated, "you have amongst you someone who knows the importance of having that cage …" (*Id.* at 16); (*see also* Trial Tr. at 417).  Defendant further maintains that Plaintiff's counsel improperly

invited the jury to disregard the law by suggesting that the MTA had the burden of proof, and by misstating the law regarding taxes or inflation that must be accounted for in an award of lost wages. (Docket No. 142 at 16); (*see also* Trial Tr. at 411-12).  Defendant argues that any curative instructions were "insufficient to cure the prejudice" caused to Defendant, and that the "totality of the circumstances" warrant a new trial because of the "clear correlation between his improper arguments and the jury's verdict[.]" (Docket No. 142 at 16-17).

Plaintiff maintains that Defendant suffered no prejudice resulting from his conduct during summations due to the Court's timely intervention and curative instruction to the jury. (Docket No. 147 at 19).  Plaintiff further argues that, contrary to Defendant's contention, he gave no specific dollar amounts for pain and suffering, but "instead gave the jury a logical general formula used by many people in everyday life as to how to make such a computation, by indirect reference to the only monetary evidence heard at trial, [P]laintiff's lost wages …" (*Id.*). Moreover, Plaintiff contends that Defendant cannot show prejudice, since "the jury did not use the method suggested" by him during summation. (*Id.* at 21).  Plaintiff next maintains that he did not, in fact, tell the jury to disregard the law on the burden of proof, since the "burden of proof as to contributory negligence rests with [D]efendant," as does the burden of proof as to the loss of earnings Plaintiff could have mitigated. (*Id.* at 22).   Plaintiff maintains that this "includes mitigation of income taxes." (*Id.*).  On this point, Plaintiff argues that "[a]s the proponent of this damages mitigating matter, it was the defendant's burden in mitigation of its damages … to put in evidence that would permit the jury to ascertain plaintiff's 'taxable income' as required by its tax tables …" and that "[b]ecause the defendant failed to provide the jury with the information it needed to properly tax [P]laintiff's lost wages, the jury was free to decline deducting taxes from

the lost wages award they made by reason of [Defendant's] failure to meet its burden of proof

…" (*Id.* at 23).

Taking into consideration the totality of the circumstances, the Court does not find that a

new trial is warranted because of the conduct of Plaintiff's counsel.  Although the Court does not

condone Plaintiff's counsel's behavior or approve of his disrespectful manner, the Court's timely

interventions combined with its numerous warnings to Plaintiff's counsel were sufficient to cure

any prejudice that may have been caused by his actions. *See Graham*, 128 F. Supp. 3d at 700

(which denied motion for new trial premised on counsel's misconduct because "its warnings to

counsel, combined with its repeated instructions to the jury that summations and statements from

counsel are not evidence, were sufficient to counteract any prejudice … that may have been

caused").  For instance, when Plaintiff's counsel improperly singled out a juror, the Court

immediately intervened, emphasizing that "[t]he only thing the jury is to consider is the evidence

that was brought out in the trial." (Trial Tr. at 417).  The Court warned counsel that his

statements were not acceptable, and that if he did this again, he would be in contempt of Court.

(*Id.*).  Moreover, because the Court found there was no evidence that the jurors were unable to

follow the rules of the Court or that they could not be fair and impartial, the parties agreed to an

appropriate curative instruction to the jury instead of excusing Juror 6.[3] (*Id.* at 439-43).  The

Court instructed the jury, in relevant part, "[y]our verdict must be based solely upon the evidence

or the lack of evidence developed at trial. It would be improper for you to consider any personal

knowledge or personal feelings you have about a party or witnesses' race, sex, age, national

origin or religion." (*Id.* at 461).

---

[3] Defendant made an application to excuse Juror 6. (Trial Tr. at 442).

The Court also gave curative instructions regarding the statements of Plaintiff's counsel on the burden of proof and suggestions of dollar amounts. (Trial Tr. at 450). Specifically, when Plaintiff's counsel suggested that the MTA had the burden of proof, (*id.* at 411-12), the Court emphasized that "[t]he burden is on the plaintiff to prove their damages," (*id.* at 428; *see also* 454-55, 458; 462). Regarding any dollar amounts suggested by counsel, the Court reminded the jury that "this is not evidence." (*Id.* at 424). The Court also advised the jury at the conclusion of summations that "the openings and summation are not evidence, and because Plaintiff's counsel pushed the line in several places today, I'm also going to instruct you that any dollar figures advanced by counsel do not constitute evidence but merely represent argument which the jury is free to disregard in its deliberations." (*Id.* at 432). In sum, while the Court found that counsel "abused his privileges in the closing statement," it did not find that it was so egregious such that "it was going to affect the outcome of the trial…" (*Id.* at 455).[4]

In light of the Court's thorough instructions to the jury, combined with its warnings to Plaintiff's counsel, the Court does not find that counsel's conduct during summations, or any other part of the proceeding, warrants a new trial. *See Patterson*, 440 F. 3d at 119 (which noted that attorneys are provided "wide latitude in formulating their arguments' to the jury" on summation, and reversal for such conduct during summation is rare) (citing *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F. 3d 253, 271 (2d Cir. 1999)); *In re Fosamax Products Liability Litigation*, 742 F. Supp. 2d 460, 483-84 (S.D.N.Y. 2010) (which found that, "[a]lthough the [c]ourt disapproves of the manner in which [counsel] delivered his summation, it cannot conclude that his unusual antics prejudiced [defendant]" where the court "repeatedly instructed the jury that an attorney's statements are not evidence and it is their own recollection of the evidence that

---

[4] Moreover, Defendant did not move for a mistrial. (Trial Tr. at 417).

controls."); *Tesser*, 370 F.3d at 321-22 (which upheld trial court's decision that new trial was not

warranted as a result of counsel's speculative and "inflammatory statements" during summations

where any potential prejudice was "adequately cured by instructions to the jury, and in any case,

in light of all the other evidence, such statements could not be considered so substantially

prejudicial as to 'in some material respect' have 'swayed' the factfinder's judgment." (internal

citations omitted).  Accordingly, Defendant's Rule 59 motion for a new trial is denied.

## C.  Motion for a Remittitur

Defendant argues that, as an alternative to a new trial, remittitur is warranted on three

grounds: (1) to correct the error in permitting the jury to award future lost wages beyond the date

of Plaintiff's termination, (2) to correct the jury's error in failing to adjust the award of lost

wages by applicable tax rates, and (3) the amount awarded for pain and suffering is excessive.

(Docket No. 142 at 18).  "If a district court finds that a verdict is excessive, it may order a new

trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial

of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley*

*Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995).  A remittitur is authorized in at least

two circumstances:

> (1) where the court can identify an error that caused the jury to include in the verdict a
> quantifiable amount that should be stricken, … and (2) more generally, where the award
> is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury
> would have awarded, although the surplus cannot be ascribed to a particular, quantifiable
> error.

*Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).  "A verdict is so high as to be

excessive … only if it surpasses an upper limit, and whether that has been surpassed is not a

question of fact with respect to which reasonable persons may differ, but a question of law. *Ahlf*

*v. CSX Transp. Inc.*, 386 F. Supp. 2d 83, 87 (N.D.N.Y. 2005).  "In the absence of a 'particular

discernible error,' as a general matter the court may not set aside the jury's award as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Leo v. Long Island R.R. Co.*, 307 F.R.D. 314, 321-22 (S.D.N.Y. 2015) (quoting *Kirsch*, 148 F.3d at 165). In its determination of whether the award is so excessive, "the court must 'accord substantial deference to the jury's determination of factual issues.'" *Frank Sloup and Crabs Unlimited, LLC v. Loeffler,* 745 F. Supp. 2d 115, 136 (E.D.N.Y. 2010) (quoting *Martell v. Boardwalk Enters.,* 748 F.2d 740, 750 (2d Cir. 1984)). In short, the court must be mindful of the jury's "broad discretion" in measuring damages, and discern an "upper limit" to assess whether the jury has surpassed it. *Leo*, 307 F.R.D. at 322. (internal quotations omitted). The decision of whether to order a remittitur is within the sound discretion of the trial court. *See Stampf*, 761 F.3d at 204.

**1. Lost Wages**

Defendant contends that the award for future lost wages should not have extended beyond February 16, 2016, the date on which Plaintiff was terminated from the MTA, and that such an award must be adjusted for applicable income tax rates. (Docket No. 142 at 18). The Court will address each argument separately.

**a. Lost Wages Beyond Termination Date**

The question of whether Plaintiff could recover an award for lost wages that extended beyond his date of termination from the MTA was fully briefed and decided in the parties' motions *in limine*. As discussed *supra*, Section II.B.2, the Court held that because Plaintiff's claims for future lost wages were grounded solely in his injury, and not in his termination, Plaintiff would be permitted to seek future lost wages based on his injury. The Court finds no reason to disturb this ruling. Indeed, the parties consented to jury instructions to this effect. (*See*

Trial Tr. at 485-86, "In considering future lost earning capacity, it is assumed that if the plaintiff

had not been injured, that he would have continued to work and receive wages for some period

of time … [B]ecause plaintiff's future lost wages claim is grounded solely in his injury, you must

not consider any future lost earnings in relation to plaintiff's termination from the MTA on

February 16, 2016." ).  The Court, therefore, finds that there was no discernable error in the

jury's calculation of Plaintiff's award for future lost wages on this basis.

### b.  Deductions of Income Taxes on Lost Wages

Defendant also argues that remittitur is appropriate because, although the jury was

instructed that its award of lost wages "should reflect [P]laintiff's wages after deduction of

taxes," (Trial Tr. at 486-87), the jury failed to do so, (Docket No. 142 at 19).  Defendant argues

that that the Court should apply a 28% tax deduction to Plaintiff's lost wages based on a tax table

offered into evidence. (*Id.* at 19).  As an initial matter, it is unclear what evidence Defendant

relies on to support this percentage, other than vaguely stating that it is "easily computed using

the tax tables offered into evidence by the MTA." (*Id.*).  Furthermore, although this table was

entered into evidence, (Trial Tr. at 236), Defendant presented no evidence to the jury

establishing the amount of taxes that should be deducted from Plaintiff's award for loss of

earnings. *See Fanetti v. Hellenic Lines Ltd.*, 678 F.2d 424, 432 (2d Cir. 1982) (noting that "a

defendant confronted with a claim for future lost wages is entitled to an after-tax charge … when

there is present in the record a stipulation of future taxes; or evidence of future taxes; or evidence

of past taxes, in which event the jury should be instructed that it is entitled to assume a future tax

amount or tax percentage of wages comparable to the past tax years").  Thus, while the jury was

properly instructed that its award of lost wages should reflect "wages after deduction," they had

no evidentiary basis upon which to do so, and the Court declines to do so now. *See id.* at 432

(which held that "[w]hile plaintiff's more recent tax returns had been received in evidence to prove his past earnings, [defendant] did not indicate before the evidence closed that it would rely on those returns to quantify future taxes … For that reason we reject [defendant's] argument that the trial judge should have … used them to make future tax calculations herself.").  Accordingly, the Court does not find that the jury's verdict should be disturbed on the basis of post-tax deductions, and Defendant's motion to remit the jury's verdict on this ground is denied.

## 2.  Pain and Suffering

Finally, Defendant argues that the jury's award of non-economic damages totaling $300,000 for past pain and suffering and $700,000 for future pain and suffering was excessive. (Docket No. 142 at 20).  For the reasons that follow, the Court finds that although the jury award for pain and suffering is at the upper limit, it is not excessive, and therefore, declines to disturb the jury's verdict on this ground.

The court's review of a jury's award of non-economic damages for excessiveness is "narrow," and it may set aside such an award only when "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014) (internal quotations omitted).  While "[a]wards for mental and emotional distress are inherently speculative[,]" *id.* at 162 (internal quotations omitted), the court must "[v]iew[ ] the evidence pertaining to pain and suffering in the light most favorable to the plaintiff," *Mazyck v. Long Island R.R. Co.*, 896 F. Supp. 1330, 1336 (E.D.N.Y. 1995), as well as consider the jury award based on "the particular facts of each case," *Ahlf, Inc.*, 386 F. Supp. 2d at 87.  Thus, "[b]ecause there is no precise way in which to calculate damages for pain and suffering, the jury's award should not be disturbed unless 'the quantum of damages found by a jury is clearly outside the maximum limit of a reasonable range.'" *Id.* at 87 (quoting *Paper Corp.*

*v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337, 350 (S.D.N.Y. 1992)).  In making this determination, "courts have found it useful to review awards in other cases involving similar injuries, while bearing in mind that any given judgment depends on a unique set of facts and circumstances." *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F. 2d 565, 568 (2d Cir. 1998). Furthermore, "[w]hen evaluating such awards, the court should compare gross verdicts for similar injuries, not the net after it has been reduced for comparative negligence." *Furey v. U.S.*, 458 F. Supp. 2d 48, 57 (N.D.N.Y. 2006).

Here, viewing the evidence in the light most favorable to Plaintiff, the Court does not find that the jury's award of damages for past and future pain and suffering is excessive.  The jury heard extensive testimony from Plaintiff and his treating physician, Dr. McWilliam, regarding the extent of Plaintiff's injury, the pain it caused him, and how it affected his overall quality of life.  Plaintiff testified that he suffers severe pain, is unable to walk or stand for long periods, and suffers general physical restrictions.  For instance, Plaintiff testified that prior to his surgery, he was having "constant" pain every day. (Trial Tr. at 181).  Plaintiff stated that when he was on restricted duty from work, his limitations involved "no walking past a certain amount … no prolonged standing. No prolonged sitting." (*Id.* at 177).  When physical therapy was no longer working, and even caused the pain to get worse, Plaintiff underwent an extensive surgical procedure on September 15, 2014, in which Dr. McWilliams "cut into the back of [his] leg," "[r]emoved the damaged portion of the Achilles," and grafted "part of his tendon from [his] big toe … and inserted four screws to attach it all together." (*Id.* at 176, 186-87).  Plaintiff's relationship with his son was also negatively affected, as he was not able to play with him in a normal capacity. (*Id.* at 183).  Plaintiff testified that as a result of the incident, he "never returned to full duty" as a police officer. (*Id.* at 176, 189).

Dr. McWilliam further testified about the extent of Plaintiff's pain and limitations, stating that in April 2015, "[Plaintiff] continued to have pain. He continued to have limitations walking. He could not run. He stated he could walk even less than half a block or up to a quarter of a mile." (Docket No. 147-3 at 29).  Dr. McWilliam told the jury about the details of the surgical procedure, explaining that it involved "the Achilles tendon repair portion of the surgery," as well as a "bone graft transfer." (*Id.* at 19-22).  Dr. McWilliam testified that, in light of the fact that Plaintiff experienced severe pain one year after the incident, it became clear that his recovery from the surgery was "prolonged and incomplete," and that Plaintiff's ankle condition could only get worse. (*Id.* at 43).  He also explained his concerns about possible nerve damage to Plaintiff's ankle since one year after the surgery, Plaintiff "continued to have swelling and weakness," and "complained of pain greater than six to seven out of ten." (*Id.* at 32-33).  Dr. McWilliam further corroborated Plaintiff's testimony that he would never be able to return to work as a full duty police officer, and would be restricted to more "sedentary work." (*Id.* at 52).  The jury also considered Plaintiff's age, 55 years, and life expectancy of an additional 24 years. (Trial Tr. at 489-90).  Based on the ample credible evidence the jury heard, the Court finds that the jury's award for pain and suffering "fairly reflects the nature and extent of the injuries sustained, the permanence and extent of the pain cause by those injuries, [and] the loss of enjoyment of life[.]" *Marcoux v. Farm Service and Supplies, Inc.*, 290 F. Supp. 2d 457, 478 (S.D.N.Y. 2003).

The jury's award for pain and suffering is also not beyond the range of awards in comparable cases involving injuries to the leg, ankle, or lower extremities where, as here, the plaintiff suffered prolonged pain, limping, nerve damage, permanent disability, inability to work full time in prior job, and/or limited interactions with loved ones. *See, e.g.*, *Williams v. Aer Lingus Irish Airlines,* 655 F. Supp. at 425, 427-29 (S.D.N.Y. 1987) (denying motion to set aside

award for pain and suffering totaling $1.2 million where plaintiff sustained severe foot injuries

resulting from elevator accident, and where he faced future surgeries, permanent limp, and

psychological trauma); *Marcoux*, 290 F. Supp. 2d at 478 (which held that awards of $800,000 for

past pain and suffering, and $1 million for future pain and suffering was not excessive where

plaintiff's injuries from accident included fractures of shaft and neck, wrist, and right foot, and

where plaintiff continued to experience pain in foot, hip, and wrist, despite medical and orthotic

foot supports, and was completely disabled for purposes of her occupation as a nurse, and was

unable to fully enjoy leisure activities of exercise, travel, and devote time to close family

members); *Boshnakov v. Bd. of Educ.,* 277 A.D.2d 996, 996, (4th Dep't 2000) (which declined to

reduce the $2 million jury award for future pain and suffering to plaintiff who sustained

"serious" injuries to his ankles and left knee, and in light of the plaintiff's expected life span (27

years) and his "unremitting pain and the need for further surgery"); *Starr v. Cambridge Green*

*Homeowners Ass'n, Inc.,* 300 A.D.2d 779, 781 (3d Dep't 2002) (which held that award of

$528,000 for past pain and suffering and $750,000 was not excessive for plaintiff who fell off a

roof, fracturing his femur, heel, wrist, and hip and where a medical expert testified that plaintiff

experienced swelling and pain in his heel and that plaintiff was likely to require further surgery.

Although the plaintiff was able to return to work, his hours were restricted and he was no longer

capable of working as a roofer); *Meng v. Dember,* No. 103506/95, 2000 WL 33706496 (N.Y.

Sup. Ct. 2000) (31–year–old Plaintiff awarded $1 million and $2 million for past and future pain

and suffering, respectively, after sustaining a fractured femur, deforming leg injury and a

peroneal nerve damage that caused foot drop after being hit by car); *Guzman v. Jay*, 303 F.R.D.

186, 198 (S.D.N.Y. 2014) (denying motion for remitter on jury's pain and suffering award of

$2.2 million for plaintiff who injured peroneal nerve, tore his ACL, PCL, and LCL, which

required surgical reconstruction, began to suffer arthritis, is unable to stand for more than two or three hours, has difficulty navigating up and down the stairs, and suffers from discomfort). Furthermore, "as a general rule, juries tend to award greater compensation for lower extremity injuries than for arm and wrist injuries." *Guzman*, 303 F.R.D. at 198; *see also Marcoux*, 290 F. Supp. 2d at 477-78 (collecting cases).

Although Defendant lists a range of jury awards that fall within a lower range, albeit without citations, (Docket No. 142-8), the Court notes that these awards "only illustrate the wide range of compensatory damage verdicts for injuries to lower extremities ... and are not germane to the issue of whether the award in this case is so high as to shock the judicial conscience." *Guzman*, 303 F.R.D. at 198. Thus, in light of the wide range of jury awards for pain and suffering in similar cases, the Court cannot conclude that the jury's award here "exceeds the upper limit of reasonable damages so as to shock the judicial conscience." *Id.* The Court, therefore, declines to disturb the jury's award for non-economic damages. Accordingly, Defendant's motion for a remittitur is denied.

## D.  Request for a Hearing to Determine Amount of Set-Off

Defendant requests a hearing to determine the amount of set-off for wages and medical expenses that the MTA already paid to Plaintiff and on Plaintiff's behalf, pursuant to 45 U.S.C. § 55 and Fed. R. Civ. P. 60. (Docket No. 142 at 22).  Prior to submitting the case to the jury, the Court ruled that if Defendant can prove that the MTA directly paid wages to Plaintiff, not from a collateral source, the Court would conduct a hearing on the issue. (Trial Tr. at 376-78); (*see also* Bench Order at 9, which held that "[i]f Defendant provides the Court with proof that its payments were not a collateral source, it may renew its motion" to preclude evidence of payments already made by MTA).

In its instant motion, Defendant requests a hearing to determine the amount of set-off it is entitled to, maintaining that the MTA will present evidence showing $71,311.24 in wages it already paid to Plaintiff, and $18,546.29 in medical expenses paid directly by MTA on Plaintiff's behalf "pursuant to his collective bargaining agreement." (Docket No. 142 at 2, 22).  Plaintiff opposes Defendant's request for a hearing on the grounds that: (1) Plaintiff neither sought at trial nor recovered any award from the jury for medical payments, (2) wages already paid were neither sought nor recovered, and (3) the collective bargaining agreement pursuant to which Defendant states it paid these expenses is not the type of payment subject to set-off under 45 U.S.C. § 55. (Docket No. 147 at 40-47).  As an initial matter, the jury did not, as Plaintiff contends, award any damages to Plaintiff in the form of medical expenses. (Docket No. 139). The Court, therefore, denies Defendant's request for a hearing to determine the amount the MTA paid in medical expenses as moot.

The Court is also not persuaded at this time, based on the limited information currently before it, that Defendant is entitled to any set-off for wages paid to Plaintiff pursuant to his collective bargaining agreement.  "In an action brought under the FELA, a 'common carrier may set off [ ] any sum it has contributed or paid to an insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought.'" *Brady v. Nat'l R.R. Passenger Corp.*, 714 F. Supp. 601, 602 (D. Conn. 1989) (quoting 45 U.S.C. § 55).  The collateral source rule, however, bars an employer from offsetting benefits paid to an employee when those benefits came from a source independent from the employer. *Id.*  "Some of these [independent] sources can include health insurance, life insurance, pensions, and other benefits." *Shepler v. Metro-N. Commuter R.R.*, No. 13 Civ. 7192(RWS), 2016 WL 1532251, at *5 (S.D.N.Y. Apr. 15, 2016); *see also King v. City of*

*New York,* No. 06 Civ. 6516(SAS), 2007 WL 1711769, at *1 (S.D.N.Y. June 13, 2007)

("Collateral sources include income from personal insurance coverage as well as employee

benefits.").  "This rule may lead to double recovery by the employee, even where the payments

originate ultimately with the employer." *Perry v. Metro-North Commuter R.R.*, 716 F. Supp. 61,

62-63 (D. Conn. 1989).  Moreover, "the availability of a set off turns not on whether the

employer is the source of the payments, but on whether they constitute fringe benefits secured by

the employee through [his] labor, or are a 'contribution' against FELA liability." *Id. at* 62.  In

other words, if the payment is "'viewed as a contribution by the employer intended to fulfill

FELA obligations, it would appear to fall within the proviso [of § 55] and set off would be

permitted.'" *Id.* (quoting *Folkestad v. Burlington Northern, Inc.*, 813 F.2d 1377, 1381 (9th Cir.

1987)).  On the other hand, if payment is "viewed as the product of the employee's labors, it is

deemed to come from a source collateral to the employer/tortfeasor rather than from the

employer/tortfeasor itself," and set-off would be prohibited by 45 U.S.C. § 55. *Id.*  To this end,

"[c]ourts have generally accepted the view that '[i]f the railroads wish to avoid the harsh result

[of double recovery to plaintiff], … they can accomplish this by specific provision in the

collective bargaining agreement.'" *Id.* at 63 (quoting *Blake*, 484 F.2d at 207 (Friendly, J.,

concurring)).

　　　　Here, Defendant vaguely asserts that it already paid Plaintiff wages in the amount of

$71,311.24 pursuant to his collective bargaining agreement. (Docket No. 142 at 2, n.1).  The

relevant portion of the collective bargaining agreement, as submitted by Plaintiff, states:

> (a) Each Police Officer shall be entitled to leave with pay for the full period of any
> incapacity due to illness, injury or mental or physical defect, whether or not service
> connected
>
> …

> (d) MTA Police Officers injured while working at a MTA transportation facility shall be treated for workers compensation purposes as if the MTA affiliate is a co-employer with the Metropolitan Transportation Authority.

(Docket No. 147-1).  The provisions of this agreement "suggests [on its face] that payments in this case were required as a fringe benefit, *without reference to FELA liability*." *Perry*, 716 F. Supp. at 63 (emphasis added).  Furthermore, the provision relating to "workers compensation" is precisely the type of collateral source payment that is not subject to set-off under FELA, *Brady,* 714 F. Supp. at 604, and which the parties and this Court have repeatedly agreed constitutes a collateral source under FELA, (*see, e.g.* Trial Tr. at 32-33, 52-53, 376); (Docket No. 142 at 10); (Docket No. 142-2 at 44-45, 56).  Any purported payments made by the MTA pursuant to this collective bargaining agreement are thus not outside the bounds of a collateral source, nor is there any "express language" therein suggesting that the agreement has any bearing on FELA liability. *Perry*, 716 F. Supp. at 63-64 (holding that "ON THE JOB INJURY" clause in bargaining agreement is "far from the express disability plan provision" for set-off); *see also Folkestad*, 813 F.2d at 1379 n.2, 1383 n.6 (which relied heavily on express language in the collective bargaining agreement characterizing payments as indemnity for FELA liability or as agreed to set-off in holding that such benefits should not be regarded as collateral source, and that railroad was entitled to a set-off).

    If, however, Defendant submits additional information to this Court, within 14 days of this Order, establishing that the wages the MTA has already paid are not, in fact, from a collateral source, this Court will review the information and determine whether a hearing is warranted. *See Okraynets*, 555 F. Supp. 2d at 453 (declining to rule on collateral source issues based on limited information in post-trial motions); *Peralta v. Quintero*, No. 12-CV-3864-FM, 2015 WL 9256948, at *3 (S.D.N.Y. Dec. 9, 2015) (permitting defendants to make a further

showing as to the amount of set-off they are entitled to following collateral source hearing and

post-hearing briefs).  Plaintiff will have 7 days thereafter to reply.  Accordingly, Defendant is

directed to submit further submissions, if any, to the Court by August 17, 2020, and Plaintiff is

directed to submit his reply, if any, by August 24, 2020.

## III.  MOTION TO STAY EXECUTION OF JUDGMENT

Finally, Defendant moves for a stay of the execution of judgment, as well as the

associated taxation of costs, (Docket No. 141), pending the disposition of its post-trial motions

pursuant to Fed. R. Civ. P. 62(b). (Docket No. 143).  Under Rule 62(b), courts have discretion to

stay the execution of a judgment at any time after judgment is entered pending disposition of

post-trial motions. *See* Fed. R. Civ. P. 62(b); *Miller v. City of Ithaca, New York*, 3:10-cv-

597(GLS)(DEP), 2015 WL 9223755, at *1 (N.D.N.Y. Dec. 17, 2015), *aff'd in part, vacated in*

*part, remanded for other reasons*, 758 F. App'x 101 (2d Cir. 2018); *Lawyers Title Ins. Corp. v.*

*Singer*, No. 3:07CV804(MRK), 2011 WL 1827268, at *1 (D. Conn. Mar. 7, 2011).  Because

disposition of the issue relating to collateral source set-off is pending before the Court,

Defendant's motion to stay execution of the judgment is granted.

## IV.  CONCLUSION

For the foregoing reasons: (1) Defendant's motion for a renewed judgment as a matter of

law pursuant to Fed. R. Civ. P. 50(b) is denied; (2) Defendant's motion for a new trial pursuant

to Fed. R. Civ. P. 59(a) is denied; and (3) Defendant's motion for a remittitur pursuant to Fed. R.

Civ, P. 59(e) is denied.  Defendant's request for a hearing to determine the amount of set-off

wages, if any, is granted in part and denied in part.  Defendant is directed to submit to the Court

any additional evidence in support of its claim that it is entitled to a set-off by August 17, 2020.

Plaintiff is directed to submit his reply, if any, by August 24, 2020.  Finally, Defendant's motion

for a stay pursuant to Fed. R. Civ. P. 62(b) is granted.  The Clerk is respectfully requested to terminate the pending motions (Docket Nos. 142, 143).

Dated:    August 3, 2020
          White Plains, New York

                              **SO ORDERED:**


                              JUDITH C. McCARTHY
                              United States Magistrate Judge